IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| (1) THE UNITED STATES OF AMERICA,  *Plaintiff*,  v.  (1) CAROL ISKI, District Attorney for the Twenty-Fifth Prosecutorial District of Oklahoma, in her official capacity,  *Defendant*. | Case No. CIV-24-493-SPS  **COMPLAINT** |

The United States of America ("United States"), pursuant to the authority of the Attorney General and at the request of the Secretary of the Department of the Interior, files this Complaint and alleges as follows:

## NATURE OF ACTION

1. The United States brings this civil action for declaratory and injunctive relief against Carol Iski, District Attorney for the Twenty-Fifth Prosecutorial District of Oklahoma, in her official capacity ("Defendant"), to prevent Defendant from further asserting that Oklahoma has criminal jurisdiction over Indians for conduct occurring in Indian country, and from unlawfully detaining and prosecuting Indians in Indian country.

2. Defendant's assertion that the State of Oklahoma has criminal jurisdiction over Indians in Indian country violates fundamental principles of federal Indian law that have been in place since the Founding Era and are deeply rooted in the United States Constitution. The longstanding rule, recently reaffirmed by the U.S. Supreme Court in *McGirt v. Oklahoma*, is that

1

the states and their political subdivisions lack criminal jurisdiction over Indians in Indian country unless Congress authorizes it. 591 U.S. 894, 898, 929 (2020) ("State courts generally have no jurisdiction to try Indians for conduct committed in 'Indian country,'" and "a clear expression of the intention of Congress" is required before states "may try Indians for conduct on their lands"); *see also* 18 U.S.C. § 1151 (defining Indian country). Congress has not authorized Oklahoma to exercise such jurisdiction. *See, e.g.*, *McGirt*, 591 U.S. at 929-30 ("Oklahoma cannot come close to satisfying this standard."); *Ross v. Neff*, 905 F.2d 1349, 1352 (10th Cir. 1990). In Oklahoma, therefore, the United States and Indian tribes share exclusive criminal jurisdiction over Indians in Indian country.

## JURISDICTION AND VENUE

3.  This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1345. This action arises under the Constitution, treaties, and laws of the United States, and the United States is bringing the action.

4.  Venue in this Court is appropriate pursuant to 28 U.S.C. § 1391(b) because Defendant is located, resides, or discharges her official duties in this District, and Defendant is a resident of the State where this District is located, and because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## PARTIES

5.  Plaintiff the United States of America, suing on its own behalf in its sovereign governmental capacity, has statutory authority to address certain crimes committed by Indians in Indian country. The United States also has a special relationship with Indian tribes and has long been "committed to a policy of supporting tribal self-government and self-determination." *See Nat'l Farmers Union Ins. Cos. v. Crow Tribe,* 471 U.S. 845, 856 & n.20 (1985). The United

States thus has an interest in the exercise of tribal criminal authority in Indian country.

6. Defendant Carol Iski is the District Attorney for the Twenty-Fifth Prosecutorial District of Oklahoma and is sued in her official capacity. The Twenty-Fifth District includes Okmulgee and McIntosh Counties, and it is within the exterior boundaries of both the Muscogee (Creek) and Cherokee Reservations. Defendant is responsible for representing the State in the prosecution of criminal matters arising in the Twenty-Fifth District, and she continues to prosecute Indians for conduct occurring in Indian country.

## GENERAL ALLEGATIONS

**A.  Absent express authorization from Congress, which the State of Oklahoma does not have, the states and their political subdivisions lack criminal jurisdiction over Indians for conduct occurring in Indian country.**

7. The United States Constitution vests Congress with plenary and exclusive authority over Indian affairs. *See Haaland v. Brackeen*, 599 U.S. 255, 276-77 (2023) (collecting cases). Congress's authority over Indian affairs encompasses subjects, including criminal law, that are normally within the purview of the states. *Id.*

8. Tribes are "distinct, independent political communities," *Worcester v. Georgia*, 31 U.S. 515, 559 (1832), that retain all aspects of tribal sovereignty not specifically withdrawn by Congress, *United States v. Wheeler*, 435 U.S. 313, 323 (1978). One aspect of tribal sovereignty that tribes retain is the inherent power to exercise criminal jurisdiction over Indians for conduct occurring on their reservations. *See Denezpi v. United States*, 596 U.S. 591, 598 (2022) (tribes possess "inherent power to prescribe laws for their members and to punish infractions of those laws") (quoting *Wheeler*, 435 U.S. at 322-23).

9. These fundamental principles of federal Indian law result in a longstanding rule regarding allocation of criminal jurisdiction over Indians for conduct occurring in Indian country: the states do not have criminal jurisdiction over Indians for conduct occurring in Indian

country absent express authorization by Congress. *See, e.g.*, *McGirt*, 591 U.S. at 898, 929 ("State courts generally have no jurisdiction to try Indians for conduct committed in 'Indian country,'" and "a clear expression of the intention of Congress" is required before states "may try Indians for conduct on their lands"); *Ute Indian Tribe of the Uintah & Ouray Reservation v. Lawrence*, 22 F.4th 892, 900 (10th Cir. 2022) (absent congressional authorization, states lack jurisdiction over cases brought against a tribe or members involving conduct in Indian country).

10.     Absent congressional authorization, the states lack criminal jurisdiction over *all* Indians in Indian country, including Indians who are members of a tribe other than the tribe on whose reservation the conduct occurred, *i.e.*, non-member Indians. *See* 25 U.S.C. § 1301(2) (affirming "the inherent power of Indian tribes . . . to exercise criminal jurisdiction over *all Indians*" (emphasis added)); *United States v. Lara*, 541 U.S. 193, 199-200, 205 (2004) (upholding Congress's authority to enact § 1301(2) and observing that it "involves no interference with the power or authority of any State").

11.     The rule that the states lack criminal jurisdiction over Indians in Indian country absent express authorization by Congress applies to "a state and its subdivisions." *See Ute Indian Tribe of the Uintah & Ouray Reservation v. Utah*, 790 F.3d 1000, 1006 (10th Cir. 2015) (Gorsuch, J.).

12.     Over the last 200 years, Congress has repeatedly passed laws embodying the rule that the states and their political subdivisions assume criminal jurisdiction to prosecute crimes committed by Indians in Indian country only as expressly authorized by Congress. *See, e.g.*, *Bryan v. Itasca Cnty.*, 426 U.S. 373, 376 n.2 (1976) ("Congress has . . . acted consistently upon the assumption that the States have no power to regulate the affairs of Indians on a reservation . . . and therefore 'State laws generally are not applicable to tribal Indians on an Indian reservation

4

except where Congress has expressly provided that State laws shall apply.'" (citations omitted)).

13. Examples of such statutes articulating a comprehensive policy of exclusive federal and tribal jurisdiction over crimes committed by Indians in Indian country include but are not limited to:

a. The General Crimes Act of 1817 ("GCA") authorizes the federal government to prosecute all crimes committed between Indians and non-Indians in Indian country, which the GCA compares to "place[s] within the sole and exclusive jurisdiction of the United States" where state laws generally do not apply. 18 U.S.C. § 1152. The GCA does not "extend to offenses committed by one Indian against the person or property of another Indian, nor to any Indian committing any offense in the Indian country who has been punished by the local law of the tribe . . . ." *Id.* Further, the GCA preserved exclusive tribal jurisdiction over crimes committed by Indians where it was reserved by treaty. *Id.*

b. The Major Crimes Act ("MCA") extended federal jurisdiction over certain crimes committed by Indians in Indian country. 18 U.S.C. § 1153. Congress passed the MCA based on its understanding that only tribes had jurisdiction to punish such crimes. *See Ex parte Kan-gi-shun-ca (Crow Dog)*, 109 U.S. 556, 557 (1883); *United States v. Kagama*, 118 U.S. 375 (1886).

c. Public Law 280 delegated federal authority to several states (but not Oklahoma) to prosecute crimes committed by Indians in Indian country. *See* 18 U.S.C. § 1162. Congress provided its understanding that the statute "confer[s] jurisdiction" on states "not having jurisdiction." *See* Pub. L. No. 280, § 7, 67 Stat. 588, 588, 590 (1953). Additionally, through both Public Law 280 and the tribal consent provision of the Indian Civil Rights Act, Congress made clear that other States may assume jurisdiction over crimes committed by Indians in Indian

5

country, but only with the consent of the Indian tribe. 18 U.S.C. § 1162; 25 U.S.C. § 1321(a)(1).

14.     Oklahoma has not assumed authority under Public Law 280 to prosecute crimes committed by Indians in Indian country, and Congress has not otherwise authorized Oklahoma to do so. *See*, *e.g.*, *Okla. Tax Comm'n v. Sac & Fox Nation*, 508 U.S. 114, 125 (1993); *United States v. Sands*, 968 F.2d 1058, 1061–63 (10th Cir. 1992); *Ross,* 905 F.2d at 1352.

15.     Instead, through Section 1 of the Oklahoma Enabling Act, ch. 3335, 34 Stat. 267 (1906), Congress specifically preserved federal authority over Indian affairs within the State, retained tribal authority, and did not permit the assertion of jurisdiction by Oklahoma over Indians. The Oklahoma Enabling Act authorized the creation of the State of Oklahoma and the adoption of a state constitution but expressly provided that nothing in the constitution

> shall be construed to limit or impair the rights of person or property pertaining to the Indians . . . or to limit or affect the authority of the Government of the United States to make any law or regulation respecting such Indians, their lands, property, or other rights by treaties, agreement, law, or otherwise, which it would have been competent to make if this Act had never been passed.

*Id.*, § 1, 34 Stat. at 267–68. It also provided that "Indian lands shall remain under the absolute jurisdiction and control of the Congress of the United States." *Id*., § 25, 34 Stat. 267, 279. This disclaimer of jurisdiction in the Oklahoma Enabling Act represented Congress's understanding that "States lacked jurisdiction over [Indians] living on the reservation." *See McClanahan v. State Tax Comm'n of Arizona*, 411 U.S. 164, 175 (1973).

16.     Congress has also demonstrated its support for tribal criminal authority by affirming and expanding it. *See, e.g.*, Tribal Law and Order Act of 2010, Pub. L. No. 111-211, 124 Stat. 2258 (codified at 25 U.S.C. § 1302) (relaxing prior statutory limitations on the sentencing authority of tribal courts); Violence Against Women Reauthorization Act of 2022, Pub. L. No. 117-103, 136 Stat. 49 (recognizing expanded inherent tribal authority to prosecute

6

non-Indians for certain crimes).

17. Congress has also provided substantial funding for tribal public safety programs and criminal justice systems, including tribal law enforcement and tribal courts in Oklahoma and nationwide. *See, e.g.*, Consolidated Appropriations Act of 2022, Pub. L. No. 117-103, 136 Stat. 49, Joint Explanatory Statement Division G at 36 (providing Bureau of Indian Affairs an additional $62 million to implement public safety changes in response to *McGirt*) (available at https://www.appropriations.senate.gov/imo/media/doc/Division%20G%20-%20Interior%20Statement%20FY23.pdf); Bureau of Indian Affairs, *Report to the Congress on Spending, Staffing, and Estimated Funding Costs for Public Safety and Justice Programs in Indian Country*, 2019 ($238.7 million for law enforcement programs, $116.8 million for detention programs, and $54.4 million for tribal courts) (available at https://www.bia.gov/sites/default/files/media_document/2019_tloa_report_final.pdf); Department of Justice, *Justice Department Announces More than $246 Million in Grants for Tribal Nations* (Sept. 21, 2022) (describing $246 million in grants to enhance tribal justice systems, strengthen law enforcement responses, and fund services for crime victims) (available at https://www.justice.gov/opa/pr/justice-department-announces-more-246-million-grants-tribal-nations).

18. Giving the states concurrent jurisdiction to apply state criminal laws to Indians in Indian country would undermine tribal self-government. It would effectively supplant tribes' right to make their own criminal laws and be governed by them. *See Ute Indian Tribe*, 790 F.3d at 1006 (Gorsuch, J.) ("[T]here's just no room to debate" that state prosecution of Indian defendant "create[s] the prospect of significant interference with [tribal] self-government." (citation omitted)); *cf. New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 338 (1983) (concurrent state jurisdiction over hunting and fishing by nonmembers would "effectively

nullify" tribal authority and allow tribe to exercise authority "only at the sufferance of the State"). And it would subject Indians "to a forum other than the one they have established for themselves," which would "plainly . . . interfere with the powers of [tribal] self-government." *Fisher v. Dist. Court*, 424 U.S. 382, 387-88 (1976); *see also Cnty. of Yakima v. Confederated Tribes & Bands of Yakima Indian Nation*, 502 U.S. 251, 265 (1992) (*in personam* jurisdiction over reservation Indians for tax purposes "would have been significantly disruptive of tribal self-government").

19. As evidenced by congressional support for and funding of tribal criminal authority, public safety programs, and criminal justice systems, the United States as trustee has an interest in protecting tribes' inherent sovereign power to exercise criminal jurisdiction over Indians for conduct occurring on their reservations exclusive of the states.

    **A.    The Muscogee (Creek) and Cherokee Reservations have not been disestablished and thus remain Indian country.**

20. In a series of treaties during the 1800s between the United States and the Muscogee (Creek) Nation, the Muscogee (Creek) Reservation was established as a new and "permanent home to the whole Creek Nation" in what is now the State of Oklahoma. Treaty With the Creeks, preamble, Feb. 14, 1833, 7 Stat. 418 ("1833 Treaty"); *see McGirt*, 591 U.S. at 897 ("In exchange for ceding 'all their land, East of the Mississippi river,' the U.S. government agreed by treaty that '[t]he Creek country west of the Mississippi shall be solemnly guaranteed to the Creak Indians.'" (quoting Treaty with the Creeks, Arts. I, XIV, Mar. 24, 1832, 7 Stat. 366, 368) ("1832 Treaty"))). The United States further promised the Muscogee (Creek) Nation that "[no] State or Territory [shall] ever have a right to pass laws for the government of such Indians, but they shall be allowed to govern themselves." 1832 Treaty, Art. XIV, 7 Stat. 368; *see McGirt*, 591 U.S. at 897.

21. And the United States promised the Muscogee (Creek) Nation that it would be "secured in the unrestricted right of self-government" with "full jurisdiction" over Indians within the Reservation. Treaty with the Creeks, etc., 1856, Art. XV, Aug. 7, 1856, 11 Stat. 700, 704 ("1856 Treaty"); *see McGirt*, 591 U.S. at 902.

22. An 1866 treaty reduced the size of the Muscogee (Creek) Reservation but otherwise preserved it. Treaty Between the United States and the Creek Nation of Indians, Art. III, June 14, 1866, 14 Stat. 786 ("1866 Treaty"); *see McGirt*, 591 U.S. at 901.

23. In *McGirt v. Oklahoma*, the United States Supreme Court confirmed that Congress never disestablished the Muscogee (Creek) Reservation and, therefore, all land within the Reservation remains "Indian country" as defined by 18 U.S.C. § 1151(a). *McGirt*, 591 U.S. at 897. The Court noted that "in many treaties, like those now before us [between the United States and Muscogee (Creek) Nation], the federal government promised Indian tribes the right to continue to govern themselves." *Id.* at 929. As a result, the Court held that Oklahoma lacked jurisdiction to prosecute McGirt, a member of the Seminole Tribe of Oklahoma, for committing a major crime within the Muscogee (Creek) Reservation. *Id.* at 928-30.

24. In an early treaty between the United States and the Cherokee Nation, the United States authorized the Cherokee Nation to "punish . . . or not, as they please," "any citizen of the United States, or other person not being an Indian" who settled on tribal lands. Treaty of Holston art. VIII, July 2, 1791, 7 Stat. 39.

25. The United States later guaranteed that the Cherokee Nation's Reservation in what is now Oklahoma "shall, in no future time without their consent, be included within the territorial limits or jurisdiction of any State or Territory," and that the Cherokee Nation would have the right "to make and carry into effect all such laws as they may deem necessary for the

government and protection of the persons and property within their own country belonging to their people or such persons as have connected themselves with them." Treaty of New Echota, art. 5, Dec. 29, 1835, 7 Stat. 478.

26. The United States further promised the Cherokee Nation that "[n]o one shall be punished for any crime or misdemeanor except on conviction by a jury of his country, and the sentence of a court duly authorized by law to take cognizance of the offence." 1846 Treaty with the Cherokee, art. 2, Aug. 6, 1846, 9 Stat. 871; see id. arts. 1, 4 (referring to the Cherokee Reservation as "the country so exchanged" and "the country west of the Mississippi").

27. An 1866 treaty that in no way limited the Cherokee Nation's authority over Indians within the boundaries of the Cherokee Reservation confirmed "[a]ll provisions of treaties heretofore ratified and in force, and not inconsistent with the provisions of this treaty." 1866 Treaty of Washington with the Cherokee, art. 31, July 19, 1866, 14 Stat. 799.

28. In *Spears v. Oklahoma*, the Oklahoma Court of Criminal Appeals applied *McGirt* to affirm that the Cherokee Reservation remained Indian country because Congress had established and never disestablished it. 485 P.3d 873, 876-77 (Okla. Ct. Crim. App. 2021); *see also Hogner v. Oklahoma*, 500 P.3d 629 (Okla. Crim. App. 2021) (holding State lacked jurisdiction to prosecute a member of the Miami Tribe of Oklahoma for alleged conduct that occurred on the Cherokee Reservation). The court noted that treaties between the United States and the Cherokee Nation, like the treaties between the United States and the Muscogee (Creek) Nation at issue in *McGirt*, "contained similar provisions that promised a permanent home that would be forever set apart, and assured a right to self-government on lands that would lie outside both the legal jurisdiction and geographic boundaries of any state." *Spears*, 485 P.3d at 876. As such, the court held that Oklahoma lacked criminal jurisdiction over Spears, a citizen of the

Cherokee Nation, because the crime alleged occurred in the Cherokee Reservation. *Id.* at 877.

29. Because the Muscogee (Creek) and Cherokee Reservations remain Indian country, the longstanding rule regarding allocation of criminal jurisdiction over Indians in Indian country applies on those reservations. *See, e.g.*, *McGirt*, 591 U.S. at 928-30; *Spears*, 485 P.3d at 876-77.

30. Thus, Oklahoma does not have jurisdiction over Indians on Indian reservations in the State, including the Muscogee (Creek) and Cherokee Reservations, because Congress has not expressly authorized such jurisdiction.

### B. Nevertheless, Defendant continues to assert criminal jurisdiction over and prosecute Indians for conduct occurring in Indian country in direct violation of federal law.

31. Despite the longstanding rule that the states do not have criminal jurisdiction to prosecute crimes committed by Indians in Indian country unless expressly authorized by Congress, Defendant continues to assert criminal jurisdiction over and prosecute Indians in Indian country, creating intolerable jurisdictional chaos in Indian country and illustrating disrespect for federal Indian law precedent.

32. Dissatisfied with the U.S. Supreme Court's ruling in *McGirt*, Oklahoma asked the Court to overturn *McGirt* just one year later in *Oklahoma v. Castro-Huerta*. *See* Petition for Certiorari, 2021 WL 4296002 at *4, *Oklahoma v. Castro-Huerta,* 597 U.S. 629 (2022).

33. In its petition for certiorari in *Castro-Huerta***,** Oklahoma acknowledged that, by holding that Congress had not disestablished the Muskogee (Creek) Reservation in *McGirt*, the Court had "deprived the State of authority to prosecute Indians who commit serious crimes there, and the Oklahoma state courts have since held that *McGirt* compels the same conclusion with respect to the remainder of the Five Tribes in Oklahoma." *Id.* at *3.

34. Although Oklahoma's efforts to have *McGirt* overturned in *Castro-Huerta* failed,

11

Defendant continues to assert criminal jurisdiction over and prosecute Indians in Indian country.

35. Defendant has brought criminal charges on behalf of the State against Indians for conduct occurring in Indian country in the following cases: *Oklahoma v. Long*, CF-2023-00086 (Dist. Ct. McIntosh Cnty.) (criminal charges against Indian for alleged conduct that occurred on the Muscogee (Creek) Reservation); *Oklahoma v. Medlock*, CF-2024-00050 (Dist. Ct. McIntosh Cnty.) (same); *Oklahoma v. Wiedel*, CF-2024-00105 (Dist. Ct. McIntosh Cnty.) (same); *Oklahoma v. Carson*, CF-2024-00149 (Dist. Ct. McIntosh Cnty.) (same).

36. In each of these cases, Defendant has argued that *Castro-Huerta*, which did not opine on state jurisdiction over Indians in Indian country, silently reversed the long-standing rule that the states lack such jurisdiction.

37. Defendant reads *Castro-Huerta* too broadly. *Castro-Huerta* considered only the "narrow jurisdictional issue" of "the State's exercise of jurisdiction over crimes committed by *non-Indians* against Indians in Indian country." 597 U.S. at 648, 653 (emphasis added). The Supreme Court stressed that the question of state criminal jurisdiction over *Indians* in Indian country was "not before us," and it "express[ed] no view on state jurisdiction over a criminal case of that kind." *See id.* at 639 n.2, 650 n.6; *see also id.* at 693 (Gorsuch, J., dissenting) ("Most significantly, the Court leaves undisturbed the ancient rule that States cannot prosecute crimes by Native Americans on tribal lands without clear congressional authorization—for that would touch the heart of 'tribal self-government.'").

38. The *Castro-Huerta* Court also recognized that the states may lack jurisdiction over crimes committed by Indians in Indian country as a result of the principle of federal law that "precludes state interference with tribal self-government." *Castro-Huerta*, 597 U.S. at 639 n.2. The Court cited two exemplar cases for this principle—*White Mountain Apache Tribe v.*

*Bracker*, 448 U.S. 136 (1980), and *McClanahan,* 411 U.S. 164.

39. Consistent with *Castro-Huerta*, the Supreme Court has repeatedly distinguished between cases involving *non-Indian* conduct in Indian country, like *Castro-Huerta*, and assertions of state jurisdiction over *Indians* in Indian country. *McClanahan* and other cases establish a nearly universal rule against state jurisdiction over Indians for on-reservation activities absent congressional authorization. *See, e.g.*, *McClanahan*, 411 U.S. at 170-71 ("State laws generally are not applicable to tribal Indians on an Indian reservation except where Congress has expressly provided that State laws shall apply."). It is only where "a State asserts authority over the conduct of non-Indians engaging in activity on the reservation" that "[m]ore difficult questions arise." *Bracker*, 448 U.S. at 144.

40. Defendant's attempts to expand *Castro-Huerta* to permit state criminal jurisdiction over non-member Indians in Indian country is improper. By continuing to prosecute Indians—including non-member Indians—in Indian country, despite overwhelming federal case law establishing that Oklahoma does not have jurisdiction over such cases, Defendant has spurned federal Indian law and has itself created jurisdictional chaos. This type of activity by state officials is intolerable and dangerous if permitted to stand and must be enjoined. Otherwise, Defendant's actions will continue to seriously impact the United States' ability to protect tribal sovereignty and its own prosecutorial jurisdiction both in Oklahoma and nationwide.

## CLAIM FOR RELIEF

41. The United States realleges each of the preceding paragraphs as if fully set forth herein.

42. Within Indian country, tribes have inherent sovereign authority to prosecute crimes committed by Indians, and the United States has statutory authority to prosecute Indians

13

who commit certain crimes. However, because Congress has not authorized it, Oklahoma and its political subdivisions lack criminal jurisdiction over Indians in Indian country.

43. Nevertheless, in violation of federal law, Defendant continues to assert criminal jurisdiction to prosecute crimes committed by Indians in Indian country. And Defendant has demonstrated her intent to continue asserting such jurisdiction absent judicial intervention.

## PRAYER FOR RELIEF

44. WHEREFORE, the United States respectfully requests that the Court grant the following relief:

    a. Declare, pursuant to 28 U.S.C. § 2201, that the State of Oklahoma lacks criminal jurisdiction over Indians for conduct occurring in Indian country located within the exterior boundaries of the State of Oklahoma, and that Defendant's continued assertion of such jurisdiction violates federal law;

    b. Preliminarily and permanently enjoin Defendant from asserting criminal jurisdiction over and prosecuting Indians for conduct occurring in Indian country absent express authorization from Congress;

    c. Award the United States all costs of suit to the maximum extent permissible; and

    d. Grant such other and further relief as the Court deems just and proper.

DATED:  December 23, 2024

Respectfully submitted,

TODD KIM, Assistant Attorney General
Environment & Natural Resources Division

*/s/ Cody McBride*
CODY MCBRIDE
HILLARY HOFFMAN
United States Department of Justice
Environment & Natural Resources Division
Indian Resources Section
P.O. Box 7611, Ben Franklin Station
Washington, D.C. 20044
Tel.: (202) 514-6755 (McBride)
Tel.: (202) 598-3147 (Hoffman)
Fax: (202) 353-1156
cody.mcbride@usdoj.gov
hillary.hoffman@usdoj.gov

OF COUNSEL:
CONOR CLEARY, Field Solicitor, Tulsa Field Solicitor's Office
United States Department of the Interior
Office of the Solicitor

*Attorneys for United States of America*